# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

J&J SPORTS PRODUCTIONS, INC.,

    Plaintiff,

    v.                                       Case No. 18-CV-470

THREE BLONDES, INC.
d/b/a Mavericks,
CAROL PETERSON,
individually and as an owner of
THREE BLONDES, INC., and
TODD PETERSON,
individually and as an owner of
THREE BLONDES, INC.,

    Defendants.

## DECISION AND ORDER FOLLOWING COURT TRIAL

This action arises under the Communications Act of 1934, as amended, 47 U.S.C. § 605, *et seq*.[1] J&J Sports Productions Inc. was granted the exclusive nationwide television distribution rights to *"Fight of the Century" Floyd Mayweather, Jr. v. Manny Pacquiao Championship Fight Program* on May 2, 2015. Defendants admit that they displayed the program at their establishment without paying the commercial rate to J&J Sports, in willful violation of 47 U.S.C. § 605. The sole dispute is the amount of damages due to J&J Sports.

## FINDINGS OF FACT

The facts of the case are simple and uncontested; the only dispute is over damages.[2] On March 11, 2019, a court trial was held wherein Christann Spannraft, a private investigator,

---
[1] J&J Sports has abandoned its claim under 47 U.S.C. § 553.
[2] According to the Joint Pretrial Report, J&J Sports sent out interrogatories and requests to admit to the defendants on April 20, 2018. (Docket # 25 at 1.) Pursuant to Federal Rule of Civil Procedure 36(a)(3), the Defendants had thirty days after being served to respond to the requests for admission; otherwise the requests

and Thomas P. Riley, corporate counsel for J&J Sports, testified. Spannraft's affidavit was entered into evidence, along with photographs and video taken by Spannraft. (Exs. 1–3.) Pursuant to Federal Rule of Civil Procedure 52(a)(1), the court makes the following findings of fact.

J&J Sports paid for and was granted exclusive nationwide television distribution rights to *"Fight of the Century" Floyd Mayweather, Jr. v. Manny Pacquiao Championship Fight Program* (the "broadcast"), which took place on May 2, 2015 and included undercard bouts and the entire television broadcast. (Ex. 5.) J&J Sports then entered into agreements with various commercial entities throughout the United States and Canada allowing them to publicly exhibit the broadcast to their patrons at a set rate depending on the maximum fire code capacity of the establishment. (Rate Card, Ex. 4.) The rate for an establishment with a capacity of 1–100 was $3,000. (*Id.*)

On May 2, 2015, Spannraft, an investigator with Audit Masters, was investigating Mavericks Pub and Grub, 2030 W. Howard Avenue in Milwaukee, as well as other locations in the area to determine if any were showing the broadcast without authorization. At approximately 9:06 p.m. Spannraft entered Mavericks. Spannraft did not pay a cover charge or observe any advertising for the broadcast. Spannraft's affidavit stated that she counted fourteen televisions in the establishment, thirteen of which were showing the broadcast. (Ex. 1 at 3.) There were three big screens. (*Id.*) Spannraft observed words on the screen identifying "Mayweather/Pacquiao" and saw video of Pacquiao and Mayweather arriving at the arena. (*Id.* at 1.) Spannraft estimated that there were approximately sixty people in the establishment. (Ex. 1 at 1.) At trial, Spannraft testified that she "did not physically count each person. It was

---

would be admitted. Defendants did not respond to any of the requests for admission. (*Id.* at 1–2.) Therefore, all requests are admitted as a matter of law.

2

kind of a guesstimate." (Trial Transcript at 5.) During cross-examination, Spannraft testified as follows:

> Q: How did you come up with that number?
> A: It was just a brief scan. I noticed the bar itself, the physical bar was full, and I just, you know, kind of looked through and thought okay that's about 25 people, and then when we went in the back room, all of the tables were filled.
> Q: Okay. Could it have been less?
> A: Perhaps a few.
> Q: Maybe 10?
> A: Oh, no. It was much --
> Q: Okay. It was closer to 60?
> A: Yes.
> Q: Okay. And you're sure of that and you're accurate about that?
> A: Yes.

(*Id.* at 9.)

Carol Peterson and Todd Peterson are the owners of Three Blondes, Inc., which owns Mavericks, and the managers and agents of Mavericks. They intended to broadcast the event for financial gain while avoiding payment of the commercial licensing fee. The broadcast was received by connecting a satellite receiver to the televisions in the establishment. No one associated with Mavericks paid the commercial rate to J&J Sports in order to show the fight.

## ANALYSIS AND CONCLUSIONS OF LAW

Defendants concede liability for willful violation of 47 U.S.C. § 605 and do not dispute attorney's fees. The only dispute is the amount of statutory damages due to J&J Sports.

Any party aggrieved by a violation of § 605 may recover actual or statutory damages. 47 U.S.C. § 605(e)(3)(C). The amount of damages is left to the discretion of the district court. The statute allows an award of statutory damages between $1,000 and $10,000 per violation. 47 U.S.C. § 605(e)(3)(C)(i)(II). If "the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain," the court may award

enhanced damages of not more than $100,000 per violation. 47 U.S.C. § 605(e)(3)(C)(ii). If "the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section," the court may reduce the damages award to as little as $250. 47 U.S.C. § 605(e)(3)(C)(iii). A prevailing party is also entitled to attorney's fees and costs. 47 U.S.C. § 605(e)(3)(B)(iii).

There is no established formula from the Seventh Circuit for calculating statutory damages under § 605 and courts have taken a variety of approaches. Some courts have used the number of patrons counted in the establishment as a yardstick, applying a damage award per patron. *See J&J Sports Prods., Inc. v. Arturo Cuevas Silvestre*, No. 16-CV-523 (E.D. Wis. Jan. 12, 2017) (awarding damages amount of $80 per patron). Some courts have awarded a flat sum—generally the licensing fee the defendant ought to have paid—as the base statutory damages amount. *J&J Sports Prods., Inc. v. Mojitos Mexican Grill & Bar, LLC*, No. 17-C-1272, 2018 WL 1709410, at *3 (E.D. Wis. Apr. 9, 2018) (using lost licensing fee of $2200 as statutory damages amount before applying modifier for willfulness); *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F. Supp. 2d 955, 960–61 (E.D. Wis. 2001) (using the lost licensing fee as a starting point for statutory damages). In general, a multiplier of between three and five has been used in cases of willful violations. *See Kingvision*, 146 F. Supp. 2d at 961. To choose a multiplier and arrive at an enhanced damage figure, courts have considered (1) the number of violations, (2) the defendant's unlawful monetary gains, (3) the plaintiff's actual damages; (4) whether the defendant advertised the event, (5) whether defendant collected a cover charge on the night of the event, and (6) "the deterrent effect of the award, with an eye toward imposing an award that is substantial enough to discourage future lawless conduct, but not so severe that it seriously impairs the viability of the defendant's business (at least for

a first offense)." *Joe Hand Prods. v. Kaczmar*, No. 08–2910, 2008 WL 4776365, at *2 (N.D. Ill. Oct. 29, 2008). Courts have also augmented the multiplier when the defendant displays the broadcast on multiple televisions. *See Kingvision*, 146 F. Supp. 2d at 961 (augmenting enhancement when defendant showed broadcast on five televisions).

J&J Sports urges the court to follow *Silvestre* and apply the "per head" test, multiplying the number of patrons present at the time by $80. (Pl.'s Post Trial Br., Docket # 30 at 2.) Because there were approximately 60 patrons, J&J Sports suggests that the appropriate damages award is $4,800, multiplied by three to enhance for willfulness. (*Id.*) However, Defendants assert that *Silvestre* is distinguishable from this case because the investigator in *Silvestre* performed an actual head count. (Def.'s Post Trial Br., Docket # 32 at 2.) Spannraft's affidavit states, and she testified, that she approximated the number of patrons present. (Ex. 1 at 1.) She testified that she did not perform a head count, and that it is possible that the number was fewer than sixty. Defendants therefore urge the court to instead use the lost licensing fee of $3,000, with a willfulness multiplier of three.

I find Spannraft's account of the number of people in the establishment largely unhelpful. Spannraft initially did not recall how she arrived at the number sixty; when she reread her affidavit, she stated she had not taken a physical headcount but had made "kind of a guesstimate." (Trial Transcript at 4–5.) Despite her testimony that she did not take a precise headcount, she was very certain that the number could not have been as low as fifty and must have been closer to sixty. (*Id.* at 9.) I have no basis on which to either credit or discredit Spannraft's skill at estimating the size of crowds, and by Spannraft's own admission she made "just a brief scan." (*Id.*) In the absence of a precise head count, I decline to apply a per-head damages award, and instead use the lost licensing fee of $3,000 as the base award.

5

Because the violation was willful, an enhancer is appropriate. Some factors favor a lower enhancer, including that there is no evidence in the record that Defendants are repeat violators, and they did not advertise the broadcast or charge a cover that night. However, other factors favor a higher enhancer, including that Defendants sold food and drinks during the broadcast and displayed the broadcast extremely prominently and purposefully in their establishment. Spannraft counted at least thirteen televisions, including three big screens, showing the broadcast in the three-room establishment. Spannraft's DVD evidence shows several of these televisions in close proximity to one another, and her affidavit describes "three very large TVs . . . right next to each other in the back bar taking up one entire wall." (Ex. 1 at 3.) It is clear that prominently displaying sporting events is a major part of Defendants' business model, and that Defendants believed this event would be of particular interest to their patrons. The degree of Defendants' willfulness in this case is high; for deterrence purposes, the statutory damages award should also be high. For this reason, I will impose a multiplier of four, for an enhanced damages award of $12,000. The total damages award is therefore $15,000.

Section 605(e)(3)(B)(iii) also gives the court discretion to award the recovery of full costs, including reasonable attorney's fees, to an aggrieved party who prevails. J&J Sports requests $3,292.50 in attorney's fees and costs. (Docket # 31.) This amount represents 8.35 hours of work at a rate of $250 per hour and $1,205 in expenses including filing and other fees and costs. (*Id.*) Defendants do not challenge the attorney's fees sought by J&J Sports, and I find them reasonable. Thus, I will award J&J Sports the sum of $3,292.50 in attorney's fees and costs.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Clerk of Court shall enter judgment in favor of the Plaintiff and against the Defendants, in the amount of $18,292.50 for statutory damages, attorney's fees, and costs.

**IT IS FURTHER ORDERED** that this action be and hereby is dismissed.

Dated at Milwaukee, Wisconsin this 10th day of April, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge